# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

STEVEN MAY,                    )
                               )
            Plaintiff,         )
                               )
      v.                       )        Case No. 09-CV-03480-NKL
                               )
MICHAEL J. ASTRUE,             )
Commissioner of Social Security, )
                               )
            Defendant.         )

## ORDER

Plaintiff Steven May ("May") challenges the Social Security Commissioner's ("Commissioner") denial of his claim for disability insurance benefits. This lawsuit involves an application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433 and under Title XVI for supplemental security income.

May's initial application was denied, and he appealed the denial to an administrative law judge ("ALJ"). After an administrative hearing was held on February 18, 2009, the ALJ found that May was not "disabled" as that term is defined in the Act. The Appeals Council denied May's request for review, rendering the ALJ's decision the final decision of the Commissioner. The Act provides for judicial review of a final decision of the Commissioner. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

May argues that the record does not support the ALJ's finding that he was not under a disability because (1) the ALJ erred by failing to properly consider whether all of May's

1

impairments were severe or non-severe at step two of the sequential process; (2) the ALJ erred by failing to properly evaluate the opinions of the treating and examining providers; and (3) the ALJ erred by not considering all the evidence of record in assessing May's Residual Functional Capacity ("RFC"). For the foregoing reasons, the Court reverses and remands the ALJ's decision.

## I.      Factual Background

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1] At the time of the hearing, May was forty-nine years old with a high school education. May's past work primarily included small engine mechanic and wire machine operator. May alleges that he became disabled on August 7, 2006. May claims he became disabled because of a traumatic brain injury, vertigo, obesity, anxiety, coronary artery disease, chromic pain, and depression.

### A.      Medical Records

On August 7, 2006, Steven May was admitted to the University of Mississippi Medical Center after a large limb fell on his head while he was standing under a tree and he lost consciousness. May was found to have an altered mental status, be intermittently confused and inappropriate and only occasionally able to answer questions and follow commands. May also required several blood transfusions and went into respiratory failure. Views of May's torso revealed a left L1 vertebra fracture; a T11-T12 burst fracture; a T10

_____

[1] Portions of the parties' briefs are adopted without quotation designated.

vertebra fracture; a T8 vertebra fracture; a scapular fracture; and a fracture of May's left distal tibia. Furthermore, a CT of May's head and neck revealed a hemorrhage in the parietoccipial region with a soft tissue injury. May then underwent surgery to correct his back fractures.

May was discharged on August 28, 2006, with a diagnosis of a mild traumatic brain injury, a T12 vertebra fracture, a scapular fracture and a left distal tibia fracture. May was transferred to the Hardy Wilson Memorial and remained there from August 28, 2006 through September 3, 2006, as an inpatient for physical therapy.

On October 5, 2006, Dr. Louis Herkey examined May and noted that May remained wheelchair bound due to his injuries and may have been experiencing problems with his emotions and/or memory. X-rays showed intact hardware in May's back with a proximal endplate irregularity of the superior T10 endplate. On November 11, 2006, May returned for a three month follow-up with Dr. Herkey who noted that May's legs were not fully strong yet.

Follow-up examinations by Dr. Harkey at 1, 3, 6, and 12 months after his injury indicated May was doing "quite well." He was neurologically intact and x-rays and CT scans showed intact hardware and no significant interval changes in May's back.

In 2006 and 2007, May also received treatment at the Veteran's Administration Hospital for diagnosed chronic ischemic heart disease, coronary artery disease, hyperlipidemia and an old myocardial infarction.

Dr. Charletta Scott conducted a consultive physical examination of May at the request

of Disability Determination Services on February 10, 2007. May reported that he had to quit his job after experiencing pain in his lower back, numbness in his left foot, and pain with weakness in his left shoulder and hand. Furthermore, May stated that he could not remember the incident and was having trouble with delayed thinking, balance, dizziness and lightheadedness. Upon examination, Dr. Scott found May to ambulate with a left-sided limp, have decreased range of motion in his lumbar spine, lose his balance with walking and be able to only partially squat. Dr. Scott also noted that May's left hand was missing parts of his fingers from the DIP joints of the third, fourth and fifth digits due to a childhood injury, but retained normal grip and fine and gross motor manipulation.

On examination, May ambulated with a normal gait and a slight limp on the left. He could get up and out of his chair, take his shoes on and off, and dress and feed himself. He had normal range of motion of his elbows, forearms, wrists, shoulders, neck, hips, knees, and ankles; decreased range of motion in his back; and negative straight leg raising. May lost his balance while attempting to perform postural maneuvers. Neurological examination indicated some mental slowing, but he could recall recent events. He had normal reflexes and motor strength, although he had some sensory loss on the top of his left foot.

Dr. Scott diagnosed May with a traumatic brain injury, traumatic fractures of the spine, mild memory loss, a tremendous problem with balance and chronic pain involving the left lower extremity. In addition, Dr. Scott recommended that May use a cane for even minimal distances due to falling.

May next returned to Dr. Harkey's office on February 19, 2007, and reported that he

continued to experience pain in his back and have issues with dizziness six months after the accident.

Dr. Madena Gibson completed a review of May's medical records on February 28, 2007, but there is no indication of which medical records were reviewed by Dr. Gibson. However, the report did indicate that there were no treating or examining source statements regarding May's physical capacities in the file.

Dr. Michael Ball examined May on November 6, 2007, at the request of Oregon County Division of Family Services. Dr. Ball's diagnosis of May included chronic pain of the neck and back. Based on May's impairments, Dr. Ball found May eligible for assistance and opined that May has a physical and/or mental disability that prevents him from engaging in employment, expected to last permanently.

Dr. Ball subsequently completed two medical source statements in regard to May's ability to perform both physical and mental work-related activities. Dr. Ball found May to be markedly limited in three areas of functioning including the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Furthermore, Dr. Ball opined that May was limited to an ability capable of lifting and/or carrying five pounds frequently and fifteen pounds occasionally; stand and/or walk for fifteen minutes continuously and two hours throughout an eight-hour workday;

sitting for forty-five minutes continuously and three hours throughout an eight-hour workday; and only able to occasionally balance, stoop, kneel and reach.

In January of 2008, May presented to Heart Care services on two occasions for ongoing trouble with back pain, dizziness and occasional tremors. May was diagnosed with coronary artery disease after an echocardiogram (EKG) was interpreted as abnormal. A follow-up exam in March of 2008, revealed ongoing excessive laboratory values and May was diagnosed with coronary artery disease, failed angioplasty, hypertension, chronic obstructive pulmonary disease and hyperlipidemia.

May was also examined at the Alton Medical Clinic on January 14, 2008, and diagnosed with depression.

On February 5, 2008, May began receiving his primary care treatment from Dr. Gregory Rakestraw and reported issues with dizziness, fatigue and pain. May returned to Dr. Rakestraw's office on February 19th and reported ongoing issues with irritability, emotional lability, depression, and anhedonia. Dr. Rakestraw performed a mental status evaluation and found May to have a flat affect, depressed mood and poor eye contact. Dr. Rakestraw again diagnosed May with depression, as well as chronic pain.

May also presented to Dr. Richard Tompson on February 19, 2008, to begin treatment for pain management. Dr. Tompson found May to have a broad based gait which was uncoordinated and administered a left joint injection. X-rays of May's spine were taken on February 26th which revealed a fusion with fixation at the T12 vertebra, a T11 wedge compression fracture and thoracic levoscoliosis and kyphosis. May returned to Dr.

Tompson's office on February 29th for another joint injection for pain and was diagnosed with sciatica, sacroilitis and an anxiety state.

On February 26, 2008, May presented to Ozarks Medical Center Behavioral Health Care for treatment for his mental impairments with William Dugan, a Licensed Clinical Social Worker. May reported that he was having trouble with becoming easily annoyed, frequent worrying, suicidal ideations and anhedonia. Upon examination, May was found to have guarded behavior, impaired immediate memory and concentration, a despairing mood and a blunted affect. Dugan diagnosed May with a major depressive, recurrent disorder and assessed a Global Assessment Functioning ("GAF") score of 45.[2]

May then continued to receive treatment from Dugan in both March and April of 2008, and reported ongoing trouble with depression and worry, which Mr. Dugan opined was primarily due to May's physical condition and his lack of funds. Moreover, Dugan also continued to assess May with a GAF score of 45. May also underwent a psychiatric evaluation at the Alton Medical Clinic on April 15, 2008, and was diagnosed with an adjustment disorder with a depressed mood.

---

[2] The GAF scale represents a clinician's judgment of an individual's overall level of functioning. It is rated with respect to psychological, social, and occupational functioning, and should not include physical or environmental limitations. A GAF score of between 31 and 40 denotes major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See Diagnostic and Statistical Manual of Mental Disorders*, 32, 34 (4th ed. text revised 2000) (DSM-IV-TR). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, shoplifting) or serious impairment of social or occupational functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 represents moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupation, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

Dugan completed a medical source statement in regard to May's ability to perform work-related activities on April 22, 2008. Dugan opined that May was extremely limited in three areas of work-related functioning including the ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, and the ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of length of rest periods. In addition, Dugan assessed May with marked limitations in seven areas of work-related functioning including the ability to maintain attention and concentration for extended periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Dugan also assessed May with moderate limitations in seven other areas of work-related functioning.

Throughout March of 2008, May also continued to receive pain management treatment and joint injections from Dr. Tompson for ongoing pain in his neck and back. Twice in March 2008, May told Dr. Tompson that the February 2008 steroid injection provided great benefit. Aleve and ibuprofen provided good pain relief and Tylenol provided great relief. Upon examination, May was calm and interacting appropriately. His back was tender to touch and he had a broad based gait. A magnetic resonance imaging (MRI) scan of May's thoracic spine indicated a healed spinal fusion, with near-anatomic alignment. Dr. Tompson gave May pain relief patch samples for his back pain.

On April 8, 2008, May was again examined by Dr. Rakestraw for trouble with dizziness. May continued to receive treatment from Dr. Rakestraw as his primary care provider throughout 2008, for all of his impairments and medication management, being seen on eight occasions from June through December 2008. At his June 2008 appointment with Dr. Rakestraw, May had no complaints of back pain. The next month, he stated narcotic medication worked really well for his pain. Examination revealed normal findings.

Dr. Clara Applegate, a neurologist, examined May on June 5, 2008, at the request of Dr. Rakestraw. May reported that he continued to have trouble with his memory and depression, as well as difficulty with balance and back pain. Upon examination, Dr. Applegate noted May was well developed and well nourished, and in no acute distress. He gave a good history of recent events, although his presentation was somewhat dramatic. Dr. Applegate assessed an unremarkable neurologic examination with nonspecific dizziness and subjective unsteadiness. Dr. Applegate noted that May was left-handed and missing the ends of three fingers on his left hand and also had decreased sensation of the left hand and left lower extremity below the knee. Furthermore, Dr. Applegate noted that May had trouble with tandem gait.

May returned to Dr. Applegate's office in August 2008. Dr. Applegate observed that May was dramatic and uncooperative during his examination, which was unremarkable. A CT scan of his head was normal with no signs of previous trauma. Dr. Applegate noted that after the visit, May had a dramatic gait with intermittent pauses when he walked down the hall, but when he walked out to his truck, he displayed no evidence of any ataxia whatsoever.

She stated that "[h]is gait was so far from anything resembling a neurologic disorder that there was no question but that it was psychogenic." She concluded that May was a malingerer and discharged him from her care without follow-up.

Ten days later, Dr. Rakestraw noted May looked good and was doing well. Examination by Dr. Rakestraw revealed normal physical and mental findings. Later that month, May stated he had been doing well and that the narcotic medication relieved his pain. Dr. Rakestraw observed that May seemed happy and satisfied. Mental and physical examinations were normal.

In September and October 2008, May told Dr. Rakestraw that the medication helped his pain "very much." May had normal physical and neurological examinations. In November 2008, Dr. Rakestraw concluded May was stable. Upon examination, he looked good and was alert, oriented, ambulatory, and in no distress.

May continued to receive psychotherapy treatment from Dugan, being seen on three occasions from June through August 2008.

May presented to Dr. Jeffrey Silverman, a cardiologist, in November of 2008, and was diagnosed with status-post myocardial infarction, coronary artery disease, failed PTCA, hypertension, hyperlipidemia and chronic obstructive pulmonary disorder.

On January 9, 2009, May returned to psychotherapy with Dugan and was noted to have worsening depression with ongoing frustration, worry and pain. May was again assessed with a GAF score of only 44-47. May stated he was worried about receiving Social Security benefits and asked him to complete paperwork. Dugan then completed another

medical source statement based on his clinical findings in which he assessed May with marked limitations in eleven categories of work related functioning.

May next presented to Dr. Rakestraw in February of 2009, after experiencing continued trouble with pain and dizziness. Dr. Rakestraw diagnosed hypertension, hyperlipidemia, lumbago, vertigo, cervicalgia, and muscle spasms. May asked Dr. Rakestraw to increase his narcotic pain medication. Dr. Rakestraw refused, but prescribed an antiinflammatory and muscle relaxant instead.

### B.     May's Testimony

On February 18, 2009, May appeared in front of Administrative Law Judge Jeffrey Hatfield via video teleconference. May testified that he continued to experience pain and limitations in his spine, shoulder and left ankle since the tree limb had fallen on him. May testified that he could not work because of the 2006 injury that continued to result in dizziness and a burning feeling in the middle of his back.

Moreover, May testified that he has trouble using his arms and experiences pain in his mid-back and becomes dizzy if he walks too fast or bends over. May testified that he tried to use a cane but cannot due to pain in his back with use and has trouble taking a shower because he becomes dizzy when he closes his eyes. May testified that he continues to have trouble with his memory and concentration and cannot work due to trouble gripping with his hand and pain with twisting his back or shoulder.

May could shower and dress without assistance, although it took him longer. He prepared meals, washed dishes, and shopped for groceries. May stated his head trauma

resulted in dizziness, but no other mental problems. He testified that his depression resulted in feelings of worthlessness. He stated he did not have any trouble concentrating or paying attention unless the pain "took over his mind." May testified that he could not grip with his hand or twist his back or shoulders. He stated he could stand for 20 minutes and lift half a gallon of milk.

### C. The Vocational Expert's Testimony

The ALJ heard testimony from a vocational expert ("VE"), Jeanine Meltildi. The VE testified in response to a hypothetical question posed by the ALJ, outlining May's age, education, work experience, and work-related limitations. Considering the exertional and non-exertional limitations described by the ALJ, the vocational expert testified that the hypothetical person could perform representative occupations of a grinder/machine worker, a film touch-up worker, and table worker.

## II. The ALJ's Decision

ALJs evaluate disability claims through a five-step process:

The claimant must show he is not engaging in substantial gainful activity and that he has a severe impairment. Those are steps one and two. Consideration must then be given, at step three, to whether the claimant meets or equals [an impairment listed in the regulations]. Step four concerns whether the claimant can perform his past relevant work; if not, at step five, the ALJ determines whether jobs the claimant can perform exist in significant numbers.

*Combs v. Astrue*, 243 Fed. Appx. 200, 202 (8th Cir. 2007) (citing SSR 86-8, 20 C.F.R. §§ 404.1520, 416.920).

After describing this process, the ALJ found that May was not disabled. At step one,

he determined that May was not engaging in substantial gainful activity since August 7, 2006.

At step two, the ALJ determined May was severely impaired by chronic pain and depression. At step two, the ALJ did not analyze any of May's other alleged impairments, including traumatic brain injury, vertigo, obesity, anxiety, or coronary artery disease, or describe them as non-severe.

At step three, the ALJ determined that May did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

At step four, the ALJ found that although May's impairments would prevent him from performing his past work, they would not preclude him from performing other work that existed in significant numbers in the national economy.

The ALJ found that May's statements concerning intensity, persistence and limiting effects of those symptoms were not credible.

The ALJ only commented on a few of the medical opinions of record. The ALJ noted that May had suffered a mild brain injury and underwent surgery due to a large limb that fell on him on August 7, 2006. The ALJ noted that May's condition improved. The ALJ noted that Dr. Scott evaluated May and that two medical consultants who reviewed May's records in February 2007 at the request of Missouri Disability determination Services concluded May could perform light exertion with postural limitations.

The ALJ noted that Dr. Ball completed medical source statements. However, the ALJ explained that he gave no weight to the "most generous assessment" of Dr. Ball because his

assessment "is not supported by the objective findings or the record as a whole." The ALJ did not comment further on the reasons why Dr. Ball's assessment was not supported by the record.

The ALJ noted that William Dugan, May's social worker, completed medical source statements finding May totally disabled. The ALJ did not comment further on the social worker's conclusions.

The ALJ noted that Dr. Applegate evaluated May and concluded that his gait was "goofy" and that he was a malingerer.

The ALJ determined that May has the RFC to perform

> sedentary work with the changing of positions every thirty minutes, no climbing of ladders/ropes or crawling, occasional climbing of ramps/stairs, balancing, stooping, kneeling or crouching and reaching overhead bilaterally, with no working in extreme cold/heat/wetness/humidity or at unprotected heights or around dangerous moving machinery. He also has mild restriction of activities of daily living, mild difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence or pace with no episodes of decompensation, each of extended duration. Accordingly, he can perform low stress work with occasional decisionmaking/judgment and with no production pace.

The ALJ offered no explanation regarding how he developed this RFC.

At the fifth step, the ALJ considered the testimony of the VE. He stated that the VE testified that a person of May's education, past work experience, and RFC would be able to perform work at the sedentary level as grinder/machine, film touch-up, or table worker, jobs which exists in significant numbers in the national economy. Therefore, the ALJ found that May was not disabled.

### III. Standard of Review

In reviewing a denial of disability benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir.2007). "On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied." *Strom v. Astrue*, No. 07-150, 2009 WL 583690, at *22 (8th Cir. Mar. 3, 2008) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choices." *See Casey v. Astrue*, No. 06-3841, 2007 WL 2873647, at * 1 (8th Cir. Oct. 4, 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

It is well-established that the ALJ carries the duty of fully and fairly developing the record. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). This is true even where a claimant is represented by counsel. *Id.*

### IV. Discussion

May argues that the ALJ erred (1) by failing to properly consider whether all of May's impairments were severe or non-severe at step two of the sequential process; (2) by failing to properly evaluate the opinions of the treating and examining providers; and (3) by not

considering all the evidence of record in assessing May's RFC.

May claims he became disabled because of a traumatic brain injury, vertigo, obesity, anxiety, coronary artery disease, chronic pain, and depression. The ALJ's opinion contains very little analysis of May's claimed conditions and the medical records. The Commissioner attempts to rehabilitate the ALJ's opinion by providing a complete analysis of the medical records. However, this post hoc analysis is insufficient to demonstrate that the ALJ's opinion was supported by the record as a whole. Under these circumstances, the Court reverses and remands for further consideration.

### A.     Step Two of the Sequential Process

At the second step of the sequential process, the ALJ determines whether the individual suffers from any severe impairments. Social Security Ruling 86-8; 20 C.F.R. § 416.920. While the burden at step two of the evaluation is on the plaintiff, this burden is minimal. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001). The ALJ should identify an impairment as non-severe only if it is no more than a slight abnormality that does not significantly limit any basic work activity. *Bowen v. Yuckert*, 482 U.S. 137, 154 (1987); *Brown v. Bowen*, 827 F.2d 311 (8th Cir. 1987). The U.S. Supreme Court has indicated that this is a *de minimus* standard. *Bowen*, 482 U.S. at 154.

The Commissioner defines a non-severe impairment as only a "slight abnormality" with a "minimal effect" on the ability to do work. *See* SSR 85-28. SSR 85-28 further states that "great care should be exercised in applying the not severe impairment concept." Since the standard at step two involves such a low threshold for satisfaction, the Eighth Circuit has

explained that "severity is not an onerous requirement for the claimant to meet . . . but it is also not a toothless standard." *Kirby v. Astrue*, 500 F3d 705, 708 (8th Cir. 2007).

Here, the ALJ determined that May was severely impaired by chronic pain and depression. However, the ALJ failed to address May's alleged impairments of traumatic brain injury, vertigo, obesity, anxiety, and coronary artery disease. The ALJ mentioned Dr. Scott's diagnosis in February 2007 of traumatic brain injury and coronary artery disease but does not offer any explanation as to why those diagnoses are non severe. The ALJ does not mention May's alleged impairments of vertigo, obesity or anxiety.

The Commissioner argues in its brief that May failed to establish that his traumatic brain injury vertigo, and coronary artery disease were severe and failed to make the twelve-month durational requirement with regard to obesity and anxiety. Contrary to the Commissioner's argument, "a reviewing court may not uphold an agency decision based on reasons not articulated by the agency." *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001) (quoting *Healtheast Bethesda Lutheran Hosp. & Rehab. Ctr. v. Shalala*, 164 F.3d 415, 418 (8th Cir. 1998)). The ALJ's statement without any discussion or factual findings of May's other claimed impairments is insufficient for the reviewing Court to determine whether May's additional alleged impairments were severe.

Because the ALJ failed to provide an adequate explanation of May's impairments his opinion is not supported by the record as a whole, and the Court remands this case to the ALJ for further consideration of the record.

**B.      Treating and Examining Source Opinions**

May argues that the ALJ failed to give proper weight to the opinions of Dr. Ball, his treating physician, and Dr. Ball's two medical source statements. May argues that a consultive evaluation performed by Dr. Scott supports Dr. Ball's assessment. May further argues that the ALJ failed to consider the opinion of his social worker, William Dugan.

With regard to Dr. Ball, the Commissioner argues that he cannot be considered a treating physician because he only saw May one time and because Dr. Ball's opinion is inconsistent with the record as a whole. However, the ALJ's opinion provides no analysis of Dr. Ball's opinion. The ALJ simply states that he gave "no weight to the most generous assessment of Dr. Ball" because "his assessment is not supported by the record as a whole."

The Commissioner's post hoc analysis of the medical records in this case is insufficient when none of these reasons were provided in the ALJ's opinion. A reviewing court may not uphold an agency decision based on reasons not articulated by the agency when the agency has failed to make a necessary determination of fact or policy. *See, e.g.*, *Banks*, 258 F.3d at 824. Generally, the court will not decide whether a source's opinion is well founded, but whether the ALJ provided sufficient reasons for rejecting the opinion of a treating source. *Gutzman v. Apfel*, 109 F. Supp. 2d 1129 (D. Neb. 2000). Although the Commissioner states that Dr. Ball should not be considered a treating source, the ALJ failed to make any findings in this regard.

With regard to the opinions of William Dugan, May's social worker, the ALJ acknowledged in his opinion that the social worker completed a medical source statement but did not provide any additional analysis of Dugan's opinion.

Under 20 C.F.R. §§ 404.1513 and 416.913, and SSR 06-03p, a social worker is not an "acceptable medical source" who can provide a treating source medical opinion, but is an important "other" medical source whose information the ALJ must consider. *See Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir.2003); *see also Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir.2006) ("By definition then, the controlling weight afforded to a 'treating source' medical opinion is reserved for the medical opinions of the claimant's own physician, psychologist, and other acceptable medical source."). "[A]n ALJ is not free to disregard the opinions of mental health providers simply because they are not medical doctors." *Duncan v. Barnhart*, 368 F.3d 820, 823 (8th Cir. 2004).

The ALJ's opinion in this case was not consistent with the regulations or Eighth Circuit law. Although the ALJ recognized the existence of Dugan's opinion, the ALJ did not even consider the assessment. The medical records show that Dugan first evaluated May on February 26, 2008, and reported that May was having trouble with becoming easily annoyed, frequent worrying, suicidal ideations and anhedonia. Upon examination, May was found to have guarded behavior, impaired immediate memory and concentration, a despairing mood and a blunted affect. Dugan diagnosed May with a major depressive, recurrent disorder and assessed a GAF score of only 45. May then continued to receive treatment from Dugan in both March and April of 2008, and reported ongoing trouble with depression and worry. Dugan continued to assess May with a GAF score of 45. May also underwent a psychiatric evaluation at the Alton Medical Clinic on April 15, 2008, and was diagnosed with an adjustment disorder with a depressed mood.

The ALJ did not analyze any of these records or the medical source statement provided by Dugan. Because the ALJ provided no analysis or explanation of his opinion, the reviewing Court is unable to determine that the ALJ's opinion is supported by the record as a whole. Accordingly, this case is remanded for further consideration by the ALJ of the record.

### C.    May's RFC

With regard to May's RFC, the ALJ stated his formulation of May's RFC after he discounted the opinions of Dr. Ball and failed to comment on most of the medical records. The ALJ stated that he determined May's RFC but there is no explanation regarding how this RFC was developed. Without appropriate explanation by the ALJ, the reviewing Court is unable to determine how the ALJ developed this RFC. Thus, the Court remands the ALJ's RFC determination.

## V.    Conclusion

The ALJ's decision is not supported by substantial evidence. However, the record does not overwhelmingly support May's claim such that an award of benefits is appropriate. *See Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000).

Accordingly, it is hereby ORDERED that May's Petition [Docs. # 3] is GRANTED

IN PART.  The decision of the ALJ is REVERSED and the case is REMANDED for further

consideration consistent with this opinion.




                                        s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated: August 16, 2010
Jefferson City, Missouri